UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

STEPHEN L. GRANT,

        Plaintiff,

        v.                                            Case No. 12-C-668

WAYNE LAUFENBERG,
JOSEPH VERDEGAN, and
SHELLEY ZAGER,

        Defendants.

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 68)

Now before the court is defendants' motion for summary judgment. Because there are genuine issues of material fact, summary judgment is denied as to plaintiff's claim that defendants retaliated against him for engaging in protected speech related to his inmate employment as a runner. On the other hand, summary judgment will be granted as to plaintiff's class of one equal protection claim respecting conduct reports as discussed below.

SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248.

A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## BACKGROUND

Plaintiff Stephen Grant was an inmate in the North Cell Hall at Green Bay Correctional Institution (GBCI) at all times relevant to this case. Defendants Wayne Laufenberg, Joseph Verdegan, and Shelley Zager are GBCI staff members who worked in the North Cell Hall.

A. Runner Position

On November 4, 2008, plaintiff informed defendant Wayne Laufenberg of his interest in the vacant runner position in North Cell Hall. The runner functions as the lead among the tier workers and receives higher pay. Laufenberg advised plaintiff that Derek Williams would be the runner. Plaintiff asked Laufenberg if there was any particular criteria for determining who would be the runner. Laufenberg responded that the runner position

has always been filled by someone from first shift.  Plaintiff questioned the practice. Plaintiff told Laufenberg that he would contact Lt. Stevens about the matter and wrote a letter to Lt. Stevens later that evening.

On November 5 or 6, 2008, plaintiff informed defendant Joseph Verdegan of his interest in the runner position and told him about the letter he had sent to Lt. Stevens. Minutes later, Lt. Stevens entered North Cell Hall.  He spoke with inmate Williams as well as plaintiff and advised them that plaintiff would be the new runner.  Afterward, Lt. Stevens left, and plaintiff informed Verdegan that Lt. Stevens was assigning him to the runner position.  Verdegan told Williams that he was against plaintiff's assignment to the runner position.

When Laufenberg returned after being off for a few days, Williams informed Laufenberg about his conversation with Lt. Stevens.  Laufenberg responded that plaintiff told him he was going to contact Lt. Stevens.  Laufenberg began expressing displeasure and opposition to plaintiff becoming the runner.  Laufenberg concluded stating, "I'll show him."  (Declaration of Derek M. Williams, ¶ 9, ECF 80.)  Over the next two weeks, and prior to November 20, 2008, Lt. Stevens spoke with first and second shift staff, including Laufenberg and Verdegan.

Plaintiff asked if he could begin training for the position.  Laufenberg said, "No.  In my eyes Williams is the runner."  (Declaration of Stephen L. Grant, ¶ 6, ECF 85.) Verdegan added, "We're going to stick with the status quo."  (*Id.*)  Verdegan told Williams to continue performing the runner duties until he was told otherwise.

Laufenberg announced that plaintiff would begin as runner effective Sunday, November 23, 2008. Plaintiff's runner pay began the pay period of November 23, 2008, through December 6, 2008.

While Laufenberg was on medical leave, Verdegan gave plaintiff tier assignments that resulted in plaintiff having little work. On November 26, 2008, plaintiff had a discussion with Verdegan about why he was not being released from his cell for work. Plaintiff asked Verdegan for a written description of the runner's position, and Verdegan replied, "wait until Laufenberg comes back." (Declaration of Stephen L. Grant, ¶ 14, ECF 85.) In a low tone of voice, plaintiff then asked Verdegan "why didn't he let me out for work earlier in the morning?" (*Id.*) Verdegan replied, "it's a habit that he forgets sometimes." (*Id.*) In the same tone of voice, plaintiff responded, "yes it's a habit when you can remember to let inmate Williams out, then also remember not to let me out when you were clearly aware that I became the runner effective 11/23/08." (*Id.* at ¶ 15.) Otherwise, "why have you been allowing me to work first shift here and there?" (*Id.*) Verdegan responded, "well I'm already mad so you go lock in." (*Id.*) Plaintiff did not believe Verdegan's directive was warranted so he brought Verdegan's conduct to the attention of Captain Laurent during lunch.

From November 27, 2008, through December 1, 2008, Verdegan continued to open Williams cell door for him to work in the runner position instead of plaintiff. Plaintiff complained about Verdegan's actions to second shift Sergeant Hofmann almost daily.

On December 1, 2008, plaintiff was served with Conduct Report 2050656, alleging disruptive conduct, which Verdegan had written on November 26, 2008, regarding his conversation with plaintiff. In the conduct report, Verdegan alleged that plaintiff had stated

4

to him "in a loud tone of voice," words that plaintiff avers he did not utter. (Affidavit of William Swiekatowski, ¶ 6, Exhibit 103.)

After a disciplinary hearing presided over by William Swiekatowski, plaintiff was found guilty and received seven days of lost recreation. Plaintiff appealed, but the disposition was affirmed. Plaintiff submits that this conduct report was false and retaliatory and that Verdegan wrote the conduct report to stop any investigation into his own conduct or other actions. Verdegan also was aware that plaintiff could be removed from the runner position through the disciplinary process.

According to defendants, inmate job duties vary based on circumstances, such as current need and safety and security concerns, and the supervisor of a unit has broad discretion to determine whether an inmate is needed for a particular duty. During the relevant time period, Laufenberg, acting as a supervisor, determined that a runner was only needed for limited duties under the circumstances in the North Cell Hall. Defendants also submit that when an inmate employee is not needed for a duty, that employee is not released from his cell to work, for security reasons. Plaintiff presented declarations to the contrary.

On January 28, 2009, plaintiff filed an offender complaint alleging that defendants Verdegan and Laufenberg were not allowing him to do all of the runner duties that plaintiff wished to perform. Swiekatowski investigated by interviewing defendants Verdegan and Laufenberg, among others, found no evidence of staff misconduct and closed the investigation.

B. Temporary Lockup (TLU) Status

On December 12, 2008, there was a disciplinary hearing on the conduct report Verdegan filed. Inmates Derek Williams and Sabir Wilcher attended the disciplinary hearing as witnesses for plaintiff. After completing their testimony, Williams and Wilcher returned to the North Cell Hall together. Shortly thereafter, Williams and inmate Sciortino were placed on TLU status in their cells following allegations of fighting. Plaintiff had not yet returned from the disciplinary hearing.

When plaintiff finally returned to the North Cell Hall, Laufenberg told the janitors to go back to their cells. Less than five minutes later, the first shift inmate workers were released from their cells; plaintiff was not.

No one came to plaintiff's cell to explain the basis for his TLU placement. Plaintiff was released from TLU status prior to lunch on December 16, 2008, after plaintiff had another prisoner deliver an interview/information request form to a security supervisor at breakfast that morning.

Laufenberg documented plaintiff's TLU status in the housing unit's Daily Activity Log Book. The documentation indicated that the placement was ordered by Lt. Van Gheem because plaintiff may have been involved in a fight.

On December 17, 2008, neither Laufenberg nor Verdegan released plaintiff for work. Plaintiff kept his cell door open after returning from breakfast on December 18, 2008. After everyone returned from breakfast, plaintiff exited his cell to gather plastic bags to fill with ice. Verdegan asked Laufenberg if he wanted plaintiff to get the ice, and Laufenberg said plaintiff's only duty was to pass out coffee because the position description for runner had changed and had not been updated. Plaintiff again requested

6

a copy of the runner position description, but Laufenberg said they did not have any. Plaintiff asked why he had been placed in TLU status, and Laufenberg replied, "because you were there when Williams and Sciortino were fighting." (Declaration of Stephen L. Grant, ¶ 28, ECF 85.) Plaintiff told Laufenberg that was not true because he was still at the disciplinary hearing. Plaintiff asked who had ordered his placement in TLU status, and Laufenberg replied, "Lt. Van Gheem, he said to lock them all up," and "he was supposed to write an incident report if he ever got around to it." (*Id.* at ¶ 29.)

A few days after plaintiff's release from TLU status, inmate Wilcher asked Verdegan if plaintiff was back as the runner? Verdegan responded, "Yes, but we're not going to let him out." (Declaration of Sabir Wilcher, ¶ 10, ECF 82.)

On March 19, 2009, plaintiff saw Lt. Van Gheem and asked him if he ordered plaintiff's placement in TLU status on December 12, 2008. Lt. Van Gheem replied, "No! Why do you keep asking me about that?" (Declaration of Stephen L. Grant, ¶ 43, ECF 85.) Plaintiff responded that he had never asked Lt. Van Gheem about that before but obviously someone else had. Lt. Van Gheem then stated, "Well I had nothing to do with that, so don't ask me about it again." (*Id.*)

C. March 4, 2009

In late February 2009, GBCI stopped serving coffee during breakfast. As a result, Laufenberg and Verdegan did not release plaintiff from his cell to work during the week days, even to assist other inmate workers. Plaintiff would only be released from his cell during first shift on Saturday mornings to assist with gathering the canteen carts. On the other hand, plaintiff was released to work during second shift. On March 3, 2009, plaintiff

forwarded a letter to the warden expressing concerns about the actions of Laufenberg and Verdegan.

On March 4, 2009, Laufenberg did not promptly depart from North Cell Hall at the end of his shift. He hung around outside the staff work station and engaged Zager in conversation. Plaintiff observed the conversation but could not hear the details.

When he was released for showers, plaintiff stopped at the staff work station and asked Zager if there was a notice or other paperwork indicating that the runner position was being eliminated. Zager said, "I don't know but Sgt. Laufenberg told me not to let you out because your job as the runner was being eliminated." (Declaration of Stephen L. Grant, ¶ 39, ECF 85.) Plaintiff responded that it was not true and informed Zager that she might become a witness in plaintiff's civil rights complaint against Laufenberg. As plaintiff proceeded toward the stairs, Zager said, "go for it." (*Id.* at 39; Declaration of Michael J. Holz, ¶ 9.) Plaintiff proceeded down the stairs without further comment.

After his shower, plaintiff asked to speak with a captain. He told her about the problems he was having with Laufenberg and Verdegan and explained that Laufenberg had persuaded Zager not to let him out of his cell to serve the dinner trays. The captain told plaintiff she would find out what was going on and speak to Lt. Stevens and Laufenberg in the morning. Zager observed and listened to this conversation from inside the staff secure workstation.

Less than five minutes later, the captain appeared outside the door to plaintiff's cell and told plaintiff that Zager was alleging that plaintiff was disruptive, had threatened her, and had disobeyed her order to lock in. Plaintiff denied the allegations and told the captain that Zager was attempting to discredit what he said to the captain earlier.

8

On March 5, 2009, plaintiff received notice of TLU placement and Conduct Report 2074206, in which Zager alleged that plaintiff disobeyed orders, was disruptive, and made threats. Swiekatowski presided over a disciplinary hearing on March 20, 2009, found plaintiff guilty, and imposed 16 days of cell confinement. Plaintiff appealed, but the disposition was affirmed.

When an inmate is on cell confinement status, the inmate cannot leave his cell to perform job duties. As a result, that inmate is put on what is called "voluntary unassigned" job status. After 16 days of being in that status, the inmate automatically loses his job as a matter of institution policy. This is the stated reason for plaintiff losing his inmate runner job. Plaintiff has chosen not to reapply for the post although he could have done so after 90 days.

## DISCUSSION

In seeking summary judgment and dismissal of plaintiff's retaliation and class of one equal protection claims, defendants argue that these claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), because success on those claims would necessarily invalidate the outcome of the disciplinary process. Defendants also submit that plaintiff's retaliation and class of one equal protection claims fail on the merits and that they are entitled to qualified immunity with respect to the class of one claims.

Plaintiff maintains that defendants subjected him to retaliatory treatment because he exercised his First Amendment rights, wrote to Lt. Stevens, and was assigned to the runner position. According to plaintiff, defendants filed false conduct reports, illegally placed him in TLU status, and treated him differently from other inmates who worked as runners with no rational basis for the difference in treatment.

9

A. Retaliation

To prevail on a retaliation claim, plaintiff must establish that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) a causal connection between the two." *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010). To show a causal connection, plaintiff must prove that his constitutionally protected conduct was a motivating factor in each defendant's alleged retaliatory action. *See Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011). If plaintiff can demonstrate that retaliatory animus was a factor, then the burden shifts to the defendants to prove that the same actions would have occurred in the absence of the protected conduct. *See id.*

Initially, the court must determine whether plaintiff's letter to Lt. Stevens constitutes speech protected by the First Amendment. Unquestionably, the letter was a written communication to a prison supervisor relating to matters of public concern and was designed to effect a change in prison policy. *See Pearson v. Welborn*, 471 F.3d 732, 741 (7th Cir. 2006) (oral complaints about prison conditions were protected by the First Amendment where they related to matters of public concern and were designed to effect a change in prison policy.) Additionally, plaintiff wrote the letter complaining of the verbal decision to automatically make someone from first shift the runner. Hence, plaintiff's letter was akin to a grievance, which is protected speech under the First Amendment. *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012).

Second, the court considers whether plaintiff suffered a deprivation that would likely deter First Amendment activity in the future. According to plaintiff, he was not allowed to

perform his job as runner, he was placed in TLU status for no reason, and he received two false conduct reports, which led to him permanently losing his runner position. These claimed consequences are more than enough to deter future First Amendment activity.

Third, plaintiff must show a causal connection between his First Amendment activity and the deprivations he suffered. Hence, the court will analyze whether plaintiff's constitutionally protected conduct was a motivating factor in each defendant's alleged retaliatory action. *See Greene*, 660 F.3d at 979. Viewing the evidence in the light most favorable to plaintiff, the non-moving party, reveals a narrative of retaliation. Plaintiff's letter to Lt. Stevens resulted in plaintiff becoming runner, a decision with which Laufenberg and Verdegan did not agree. After plaintiff became runner, Laufenberg and Verdegan (and, later, Zager) consistently prevented plaintiff from performing his duties. Moreover, they punished him by filing conduct reports, which resulted in a loss of recreation and cell confinement, and placed him on TLU status, which was also cell confinement. Based on plaintiff's version of events, there was no legitimate basis for these actions and a jury could find that plaintiff's letter to Lt. Stevens and the subsequent decision that plaintiff became runner were motivating factors in each defendant's retaliatory action.

Plaintiff does not try to show retaliation merely by speculation or suspicious timing. Rather, he sets forth a chronology of events, including defendants' statements, escalating actions, and the expansion of actions that affected him adversely. From those circumstances a retaliatory motive may be inferred. *See Chatman v. Pierce*, 583 Fed. Appx. 548, 550 (7th Cir. 2014) (citing *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009). The course of conduct evident in plaintiff's version of the facts, combined with the timing, is enough for a reasonable jury to conclude that each defendant retaliated against

11

plaintiff for his exercise of his First Amendment rights. This shifts the burden to defendants to prove that the same actions would have occurred in the absence of the protected conduct. *See id.*

Defendants' submissions contain some evidence attempting to show that the same actions would have occurred in the absence of plaintiff's protected conduct. For instance, defendants aver that each of plaintiff's conduct reports was truthful and warranted. Additionally, they suggest that the assignment of duties to inmate workers is discretionary and on an as needed basis. Defendants also state that inmate workers are released to work when there are duties for them to perform. Otherwise, the inmate is kept in his cell.

On the other hand, plaintiff presents evidence contradicting defendants' assertions. The declarations of inmates Michael J. Holz, Derek M. Williams, and Sabir Wilcher, as well as plaintiff's own supplemental declaration, suggest the actions taken respecting plaintiff were a departure in how a runner (or other tier workers) are usually treated.

According to Holz, "it was so obvious that Grant was let out only to serve coffee at breakfast time then lock back in his cell. As the head tier tender (runner), Grant was truly being treated unfairly despite there being numerous things to do as the runner." (Declaration of Michael J. Holz, ¶ 6, ECF 83.)

Wilcher states directly, "[a]t no time during the period when Mr. Grant was the assign runner did Sgt. Laufenberg and/or CO Verdegan, require any of the other tier runners to lock in or return to their cells due to no work for us to perform. This only occurred with Mr. Grant." (Declaration of Sabir Wilcher, ¶ 12, ECF 82.) Further, "[w]hen Mr. Grant was in TLU status and subsequently removed from his employment, no one was

12

kept in their cells or told they could not come out unless Sgt. Laufenberg had something for them to do." (*Id.* at ¶ 13.)

Even Laufenberg and Verdegan's choice for the runner position concludes that limited job assignments had nothing to do with why Laufenberg and Verdegan were not allowing plaintiff out of his cell to perform his duties as the runner. Williams avers, "Sgt. Laufenberg never told the tier janitors, myself or Grant for that matter, that we could not come out and work unless Sgt. Laufenberg himself had a task for one of us to do. The mere fact that the runner must assist the tier janitors with their duties, is a logical conclusion that work is always available for the assigned runner." (Declaration of Derek M. Williams, ¶ 15, ECF 80.) Plaintiff also provides detailed information regarding the role of runners generally in his own supplemental declaration.

On this record, the court is unable to determine as a matter of law whether the same actions would have occurred in the absence of plaintiff's protected conduct inasmuch as the parties' different versions of the facts may lead to different results. These factual disputes preclude the court from granting summary judgment on plaintiff's retaliation claims.

B. Class of One Equal Protection

Defendants argue that decisions such as what work to assign a prisoner each day and whether to issue a conduct report are discretionary and are not the type of decisions that lend themselves to class of one equal protection claims. *See Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008).

In *Engquist*, the Supreme Court held that a public employee could not maintain a class of one equal protection claim based on allegations that she was arbitrarily treated differently from similarly-situated employees. The Court explained that cases in which class of one claims exist in the equal protection context involve "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed." *Engquist*, 553 U.S. at 602. The Court further explained:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be treated alike, under like circumstances and conditions is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id.* at 603. The Court found that allowing claims in such discretionary circumstances would mean that "governments will be forced to defend a multitude of such claims in the first place, and courts will be obliged to sort through them in a search for the proverbial needle in a haystack." *Id.* at 608. "In short," the Court held, "ratifying a class of one theory of equal protection in the context of public employment would impermissibly constitutionalize the employee grievance." *Id.* at 609 (quotations omitted).

Courts have extended the reasoning of *Engquist* to include other types of discretionary decisions, including a prosecutor's decision to bring a case in federal, rather than state, court, *United States v. Moore*, 543 F.3d 891, 90-01 (7th Cir. 2008), and

decisions made in the prison disciplinary context, *Taliaferro v. Hepp*, No. 12-cv-921-bbc, 2013 WL 936609, at *6 (W.D.Wis. Mar. 11, 2013).

Here, defendants submit that their discretionary decisions regarding when to let plaintiff work, when to place a prisoner in TLU status, and when to write a conduct report are protected by *Engquist*. With due regard for these arguments, the court is satisfied that these are exactly the types of decisions where allowing prisoners to bring claims for the arbitrary singling out of a particular prisoner would undermine the discretion correctional officers are entrusted to exercise. *See Engquist*, 553 U.S. at 603. Not all inmate runners may perform the same tasks. Nor may all decisions to place an inmate in TLU status or to write a conduct report produce the same result given the "vast array of subjective, individualized assessments" that go into each decision. *Id.* Hence, the defendants have established that they are entitled to summary judgment on plaintiff's class of one equal protection claims.

Defendants further submit that plaintiff's equal protection claims are really retaliation claims masquerading as equal protection claims. *See Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005). In *Thayer v. Chiczewski*, the Seventh Circuit considered parallel claims for First Amendment retaliation and class of one equal protection based on plaintiff Thayer's allegations that he was treated differently than other speakers at a conference due to his political activism. 705 F.3d 237, 255 (7th Cir. 2012). The court noted, "[i]t may be proper to find that the equal protection and First Amendment claims coalesce; thus, requiring that they fall together. *See Vukadinovich v. Bartels*, 853 F.2d 1387, 1391-92 (7th Cir.1988) (dismissing equal protection claim that constituted 'a mere rewording of plaintiff's First

15

Amendment retaliation claim')." *Thayer*, 705 F.3d at 255. It is not necessary, though, for this court to dismiss the claims as a repackaging because they fail on the merits as discussed above.

C. *Heck v. Humphrey*

Next, defendants argue that plaintiff's claims regarding conduct reports are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), which "forbids a prisoner in his civil rights case to challenge a finding in his criminal or prison-discipline case that was essential to the decision in that case; if he insists on doing that, the civil rights case must be dismissed." *Moore v. Mahone*, 652 F.3d 722, 723 (7th Cir. 2011). But the Seventh Circuit noted in *DeWalt v. Carter*, 224 F.3d 607, 617 (7th Cir. 2000), that *Heck* applies only if the discipline affected the fact or duration of the prisoner's sentence. Plaintiff's loss of recreation and restriction to his cell, and even the loss of his runner position, did not affect the fact or duration of plaintiff's sentence. Therefore, *Heck* does not apply.

D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity on plaintiff's class of one claims. They submit that, under current law, it would not have been clear that their actions violated equal protection class of one principles. The Seventh Circuit's inability to produce a majority opinion in *Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012), shows that the law concerning class of one challenges to the decisions of the police as to which laws to enforce, and how vigorously they should enforce those laws, is anything but clearly established. *Bond v. Atkinson*, 728 F.3d 690, 693 (7th Cir. 2013). However, the court does not need to decide the issue of qualified immunity regarding

plaintiff's class of one claims because they have already been resolved on the merits. Therefore,

IT IS ORDERED that defendants' motion for summary judgment (Doc. 68) is GRANTED in part and DENIED in part.

Dated at Milwaukee, Wisconsin, this 18th day of March, 2015.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. District Judge